**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

FREDERICK N. BONDURANT, et al.,

        Plaintiffs,

v.

AIR LINE PILOTS ASSOCIATION, and THE
NORTHWEST AIRLINES MASTER
EXECUTIVE COUNCIL, jointly and severally,

        Defendants.

_____/

Case No. 07-15383

HON. MARIANNE O. BATTANI

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

Before the Court is Defendant Air Line Pilots Association's ("ALPA") Motion for Summary Judgment. (Doc. 38). Plaintiffs' complaint alleges that Defendants violated the Age Discrimination in Employment Act ("ADEA"), the Elliot-Larsen Civil Rights Act ("ELCRA"), and their duty of fair representation ("DFR") by failing to fairly administer Plaintiffs' unsecured prepetition bankruptcy claims.[1] For the reasons discussed below, the Court grants Defendant's Motion for Summary Judgment.

---

[1] Plaintiffs also had various other state law claims, but they withdrew these claims in their response to ALPA's motion. (See doc. 50 at 33 n.30).

## II. STATEMENT OF FACTS

The six Plaintiffs are former Northwest Airlines ("NWA") pilots who retired between July 3 and 24, 2006. Five of the Plaintiffs retired at age 60, the federally mandated retirement age for commercial pilots at the time,[2] while Plaintiff Holliker retired approximately seven weeks before his 60th birthday.

As a result of NWA's financial difficulties, ALPA agreed to three concessionary CBAs. The first agreement, known as the Bridge agreement, began on December 1, 2004. The second agreement was known as the Interim agreement. The third agreement was entered into in March 2006 and became effective on July 31, 2006. It was known as the Bankruptcy Restructuring Agreement ("BRA"). It provided ALPA with an unsecured prepetition bankruptcy claim of $888 million (the "Claim"). In addition, NWA agreed to give ALPA a lump sum payment of $16.8 million. This agreement ran through December 31, 2011. Accordingly, 85 months would pass from the beginning of the Bridge agreement to the anticipated end of the BRA.

The terms of the BRA were memorialized in various Letters of Agreement. Letter 2006-01 stated that the agreement was projected to produce an average annual labor cost of $358 million from 2007 through 2010. Letter 2006-03 provided that ALPA "would have an allowed general unsecured pre-petition claim in [NWA's] chapter 11 case in the amount of $888 million, as set forth in the attached Schedule . . . in respect of the concessions made by ALPA, as reflected in the ALPA Bridge Agreement and the ALPA Restructuring Agreement." The schedule attached to the letter set forth the following:

---

[2] In December 2007, the mandatory retirement age for commercial pilots was raised to 65.

| Source of Savings | Effective Date | Savings |
|---|---|---|
| ALPA Bridge Agreement | 12/1/04 - 12/31/06 | $521 Million |
| Interim Agreement | 11/15/05 - 2/28/06 | $81 Million |
| Restructuring Agreement | 4/1/06 - 12/31/06 | $269 Million |
| Retiree Medical | 4/1/06 - 12/31/06 | $17 Million |
| Total: | | $888 Million |

There was testimony from various ALPA officials that this $888 million figure was a negotiated figure. In particular, the figures from the schedule were arrived at by using $888 million as "a starting figure, and they simply went in and they picked things to add up – they forced [the] figures to add up to 888 million." In his deposition, William Dollaway, the ALPA Negotiating Committee Chairman, stated that the $888 million number "is a negotiated number for our claim. . . . [O]ur original claim was much larger."

In September 2006, the NWA Master Executive Council ("MEC") appointed an Eligibility Committee to make recommendations regarding how to divide the Claim among the eligible pilots. The Eligibility Committee wanted to distribute the Claim in a manner that would help to offset the losses suffered by pilots working under the concessionary agreements. In particular, Mark Shanahan, a NWA captain and member of the Eligibility Committee, testified that the Committee wanted a pilot's share of the Claim to reflect the time the pilot worked under the three concessionary agreements. Therefore, the Committee recommended that there be an 85-month eligibility period encompassing the time from the beginning of the first concessionary contract to the anticipated end of the BRA on December 31, 2011. Furthermore, pilots would receive one month of eligibility credit for each month that they served as an active pilot during

this period, such that a full share would be provided if a pilot was active for 85/85 of the months in the eligibility period.

The Committee also wanted to give pilots control of their share of the claim as soon as possible.  In other words, the Committee members wanted to distribute the Claim shares before the December 31, 2011 end of the eligibility period.   By distributing the Claim shares to the pilots at an earlier date, the pilots could individually chose whether to participate in any pre-bankruptcy Claim sales or to wait and take their Claim as a part of the post-bankruptcy estate.  The problem the Committee faced was that it could not know in advance which pilots would be active for the duration of the BRA.  For example, not only would it be impossible to know which pilots would voluntarily leave NWA during the eligibility period, but even pilots who would reach the federally-mandated retirement age before the end of the eligibility period could continue to fly as second officers.  Accordingly, the Committee recommended that the NWA MEC establish a bright-line cutoff date, whereby it would be assumed, for the purposes of Claim allocation and distribution, that any pilot who was active on the cutoff date would continue to be active for the remainder of the 85-month period.

The NWA MEC accepted the Committee's recommendation and, after considering a November 2006 cutoff date, adopted a bright line cutoff date of July 31, 2006, which was the effective date of the BRA.  One of the reasons that the NWA MEC adopted the July 31, 2006 date was because the BRA had an early retirement incentive and adopting a later date would have financially harmed pilots who accepted early retirement under the BRA.

Although a bright line cutoff date was used for determining the proper distribution of the $888 million claim, the entire $16.8 lump sum payment was distributed at once to all of the pilots working for NWA when it emerged from bankruptcy on May 31, 2007. Shanahan indicated that he understood the $16.8 million lump sum payment to be in consideration of the $358 million in annual savings that resulted from the BRA.

In December 2006, ALPA reached an agreement with NWA whereby it could sell 20% of the Claim before NWA's bankruptcy exit. Claim sales were going to be held in January, March, and April 2007. On January 8, 2007, the NWA pilots were notified that they could opt-in to the claim sale through a website. This letter also stated the following:

> *NOTE: Phase Two of the website will provide you with ESTIMATES of your allocation of the total ALPA claim.* ***THE AMOUNTS SHOWN ARE ESTIMATES ONLY.*** *Every effort has been made to ensure that the estimates are as accurate as possible, but you must be aware that your actual allocations of the total ALPA claim may be greater or smaller than the estimates shown on the website.*

In early 2007, Plaintiffs entered their information into ALPA's claim website. They were informed that they would each receive a full 85/85 share of the claim. Bartels and Shanahan reviewed the Claim share estimates produced by the website and corrected "hundreds of errors." One of the things they noticed was that no pilots were assigned 20 months of eligibility credit. They determined that this was an error because pilots leaving NWA after May 31, 2006 but before the July 31, 2006 cutoff date should have had 20 months of eligibility credit. On February 4, 2007, Shanahan sent an email to these pilots and advised them that their Claim share been reduced to 20/85.[3]

---

[3] An email was not sent to Plaintiff Holliker until March 8, 2007.

5

On March 7, 2007, Plaintiffs Thompson and Mathison argued to the MEC that pilots retiring in July 2006 should receive a full Claim share. In an April 25, 2007 publication of "Hotlines," the MEC indicated that it had determined that July retirees were not entitled to a full 85/85 share. Letters notifying Plaintiffs of these decisions were mailed on May 18, 2007. This lawsuit followed.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) authorizes the Court to grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." There is no genuine issue of material fact if there is not a factual dispute that could affect the legal outcome on the issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant summary judgment, this Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 332 (6th Cir. 2008). However, the nonmoving party "cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial." Chappell v. City of Cleveland, 585 F.3d 901, 906 (6th Cir. 2009).

### IV. ANALYSIS

Plaintiffs claim that Defendants violated their rights by (1) discriminating against them based on their age in violation of the ADEA and ELCRA, and (2) violating the union's duty of fair representation.

1.  Age Discrimination Claims

Under the ADEA, a union may not "discriminate against[ ] any individual because of his age." 29 U.S.C. § 623(c)(1). It may, however, take action "based on reasonable factors other than age." 29 U.S.C. § 623(f)(1). Similarly, under ELCRA, a labor organization shall not segregate or classify its membership because of age in a way that would adversely affect the employees benefits or conditions of employment. MICH. COMP. LAWS § 37.2204(b). "ELCRA claims are analyzed under the same standards as federal ADEA claims." Geiger v. Tower Auto., 579 F.3d 614, 626 (6th Cir. 2009).

A plaintiff can establish a violation of the ADEA using either direct or circumstantial evidence. Id. at 620. Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Id. (quotation omitted). Circumstantial evidence, on the other hand, "does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." Id. (quotation omitted). Regardless of whether a plaintiff uses direct and circumstantial evidence, he bears the burden of persuasion to demonstrate that age was the but-for cause of his employer's adverse action. Id.

    a.     Direct Evidence

Plaintiffs contend that various statements by Bartels, who was a member of the Eligibility Committee that created the eligibility formula, constitute direct evidence of discrimination.

In a December 28, 2006 email, Bartels indicated that there was concern that the November 2006 cutoff date — which was considered because it was the latest date on which ALPA knew whether the pilots were actively employed — was too arbitrary and that the July 31, 2006 implementation of the BRA was more concrete and defensible. According to Bartels, this also avoided the problem of having pilots who took advantage of the BRA's early retirement provision from suffering financially for retiring early. Additionally, Bartels stated that the decision to grant a full Claim share to pilots retiring during the BRA but after the cutoff date was made as a result of legal advice that to do otherwise might violate the ADEA. Bartels wished that there were not second officer positions for pilots to take upon reaching the mandatory retirement age because this would have allowed ALPA to assume that all pilots would retire when they reached the mandatory retirement age. As Bartels stated in another email, "If we could've assumed that all pilots would retire at [the mandated retirement age], we would have, and ended eligibility at that point, but again, we couldn't. (Legal concerns)." When asked in a different email whether pilots retiring shortly after the cutoff date would get a full Claim share, Bartels replied:

> The short answer is, unfortunately, yes. The [ADEA] requires it, according to ALPA Legal. All pilots who are not awarded [early retirement under the BRA] who retire after [the cutoff date] will get credit for the distribution proportion through 12/2011. . . . The only "good" news about this is that if the [mandatory retirement] age gets raised above 60, then we have addressed the concern of those who may continue past 60 . . . . [T]he really bad news is, though, that many pilots retiring soon will get full credit for the concession period. We tried to find a way around it but couldn't.

Plaintiffs argue that Bartels' statements are like those addressed by the Michigan Court of Appeals in <u>Burke v. Detroit Pub. Sch.</u>, No. 262983, 2006 WL 1156366 (Mich.

8

Ct. App. May 2, 2006) (unpublished). In <u>Burke</u>, the plaintiff, a school teacher, claimed that she was discriminated against because she was Caucasion. <u>Id.</u> at *1. There was evidence that the principal had stated, "[If] I had my way it [sic] wouldn't be any [white teachers] in here," but that he would "keep some" because he "ha[d] to." <u>Id.</u> The principal also stated that he planned to reassign those teachers to the seventh and eighth grade where "the kids will eat them alive." <u>Id.</u> The Court of Appeals concluded that this testimony regarding the principal's "plans to rid the school of several white teachers including plaintiff" constituted direct evidence of discrimination. <u>Id.</u> at *3.

Plaintiffs' argument that the "if I had it my way" and "because we had to" statements in <u>Burke</u> are similar to Bartels' statements is unpersuasive. Unlike the employer in <u>Burke</u>, none of Bartels' statements evidenced a plan to "rid" the union of certain employees/members. Instead, they only showed that he wished he could avoid granting a full Claim share to pilots who retired after the cutoff date but before the end of the BRA concessions. As the Claim was meant to compensate the pilots for working under the concessionary agreements, a jury could easily conclude that Bartels simply was expressing his desire to distribute the claim share in a fair and equitable manner. As such, this evidence does not *require* the conclusion that unlawful discrimination was a motivating factor for Bartels.

Likewise, Bartels's desire to allow individuals who elected to take an early retirement under the BRA to receive a full Claim share also does not require the conclusion that unlawful discrimination was a motivating factor. See <u>Geiger</u>, 579 F.3d at 620. A jury could conclude that Bartels simply did not want to have the BRA

encourage pilots to retire early on one hand only to then financially harm those pilots for making that decision by not granting them a full Claim share.

Accordingly, as none of Plaintiffs' evidence requires the conclusion that unlawful discrimination was a motivating factor in ALPA's actions, they have failed to present direct evidence of age-based discrimination. See id.

b. Circumstantial Evidence / Disparate Impact

Plaintiffs argue that they have presented circumstantial evidence of discrimination because they have shown that ALPA's actions had a disparate impact upon older pilots. In order to make out a prima facie case of an ADEA disparate impact claim, an employee must isolate and identify specific employment practices that are responsible for an observed statistical disparity. Smith v. City of Jackson, 544 U.S. 228, 241 (2005); Kovacevich v. Kent State Univ., 224 F.3d 806, 830 (6th Cir. 2000). Once a prima facie case is established, the defendant must articulate a legitimate business reason for the employment practice. Id. The burden then shifts back to the plaintiff to either show that the explanation is a pretext for discrimination, or that there exists an alternative employment practice that would achieve the same business ends with a less discriminatory impact. Id. Employers may, however, avoid liability if they affirmatively show that their actions were based on reasonable factors other than age. See 29 U.S.C. § 623(f)(1); Allen v. Highlands Hosp. Corp., 545 F.3d 387, 404 (6th Cir. 2008).

As an initial matter, the Court notes that, contrary to Defendant's assertion, Plaintiffs claim may survive despite the fact that it compares two subgroups within the "over 40" protected class. See, e.g., Barnes v. Gencorp Inc., 896 F.2d 1457, 1466 (6th

Cir. 1990 ("An employer violates ADEA when preference is given to a younger employee even if the younger employee is within the protected class of persons age 40-and-over.").

In showing that Defendants' actions disparately impacted them, Plaintiffs' assert that, upon reaching the mandatory retirement age of 60, approximately 74% of pilots retire instead of taking a position as a second officer. In addition, the "vast majority" of pilots receiving full Claim shares are younger than Plaintiffs. Also, Plaintiffs state that using the December 2004 – December 2011 instead of the December 2004 – December 2006 eligibility period reduced the shares of all of the (older) pilots who retired between December 2004 and December 2006. Finally, Plaintiffs' contend that the inference that any pilot who was actively employed at the cutoff date would continue to be actively employed through the end of the eligibility period only benefitted pilots who were younger than Plaintiffs.

ALPA responds by noting that, under the eligibility system it adopted, 176 pilots younger than Plaintiffs received less eligibility credit than they did. In addition, 73 pilots older than Plaintiffs received more eligibility credit.

Plaintiffs statistical evidence in this case falls far short of satisfying their burden of isolating and identifying specific employment practices that are responsible for an observed statistical disparity. See Smith, 544 U.S. at 241. Among other things, Plaintiffs statistical evidence fails to show that the use of a cutoff date that was based on *active employment*, as opposed to age, disparately affected older pilots.

The use of the July 31, 2006 cutoff date benefitted any pilot who was actively employed as of July 31, 2006, and was detrimental to any pilot whose employment

ceased before this date. Plaintiffs' submit that 74% of the pilots who reached the mandatory retirement age before the cutoff date would have retired, and therefore been harmed by the use of the cutoff date. But, any "younger" pilot who stopped working before the cutoff date also would have been harmed. This is confirmed by Defendants' evidence that 176 pilots younger than Plaintiffs received a smaller Claim share than Plaintiffs. In addition, the use of the cutoff date likely benefitted some pilots older than Plaintiffs. For example, any pilot who reached the mandatory retirement age before the cutoff date but elected to continue working as a second officer could have chosen to retire shortly after the cutoff date and received a full Claim share. In fact, it appears likely that some "older" pilots have or will benefit in precisely this way in light of Defendants' evidence that 73 pilots older than Plaintiffs received a full Claim share; in other words 73 pilots older than Plaintiffs remained actively employed as of the July 31, 2006 cutoff date. As such, Plaintiffs statistical evidence does not show that the July 31, 2006 cutoff date had a disparate impact on older pilots. Likewise, Plaintiffs' have presented no statistical evidence showing that the adoption of the December 2004 – December 2011, instead of the December 2004 – December 2006, eligibility period had a disparate impact on older pilots.

Accordingly, because Plaintiffs have failed to offer statistical evidence showing that any of specific action by ALPA had a disparate impact on older employees, they have failed to make out a prima facie claim of age discrimination using circumstantial evidence. See Smith, 544 U.S. at 241; Geiger, 579 F.3d at 626. As Plaintiffs have failed to offer either direct or circumstantial evidence showing age discrimination, the

Court finds that ALPA is entitled to summary judgment of Plaintiffs' ADEA and ELCRA claims.

2.      Duty of Fair Representation claims

A union owes a duty of fair representation to its members. See Steele v. Louisville & N.R. Co., 323 U.S. 192, 199 (1944). Under this duty, "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953). Thus, judicial review of a union's performance is "highly deferential." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 78 (1991). In order to breach the union's duty of fair representation, its actions or omissions must have been arbitrary, discriminatory, or in bad faith. Garrison v. Cassens Transport Co., 334 F.3d 528, 538 (6th Cir. 2003). Each of these wrongs is mutually independent, such that they are distinct ways a union may breach its duty. Id.

In their response to ALPA's Motion, Plaintiffs contend that ALPA's actions were arbitrary and discriminatory. For the reasons that Plaintiffs ADEA and ELCRA claims fail, however, they have likewise failed to show that ALPA's actions were discriminatory. Accordingly, their DFR claim can only survive if they have presented evidence indicating that ALPA's actions were arbitrary.

"[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." O'Neill, 499 U.S. at 67 (quotation omitted). Mere

13

negligence, ordinary mistakes, errors, or flaws in judgment is insufficient. Garrison, 334 F.3d at 538. Thus, a plaintiff must show that the union's actions were "wholly irrational," which is a standard that has been described as "extreme arbitrariness." Id. at 538-39.

Plaintiffs have not created a genuine issue of material fact regarding whether ALPA's actions were arbitrary. ALPA adopted a cutoff date in order to distribute the Claim shares quickly and fairly. ALPA believed that the use of the cutoff date was the best way to approximate at an early date how long the pilots would work under the concessionary agreements. This did give an unearned benefit to any pilots who retired after the cutoff date but before the end of the eligibility period. Plaintiffs, however, have not presented evidence indicating either that ALPA was not, or should not have been, motivated by these goals or that another distribution method would have better achieved these goals. For example, giving a full Claim share to all pilots, regardless of whether they retired during the eligibility period, would have severely undercut the goal of apportioning the Claim shares in accordance with the amount of work the pilots did under the concessionary agreements. On the other hand, waiting until the end of the eligibility period to distribute all of the Claim — at which point ALPA could have known exactly how long each eligible pilot worked during the eligibility period — would have significantly delayed distribution of the Claim to the pilots.

Likewise, although ALPA initially considered using a November 2006 cutoff date because that was the latest date on which they could compile all of the information necessary to calculate each pilot's share, it eventually adopted the July 31, 2006 cutoff date because it corresponded with the effective date of the BRA. This date also served not to prejudice pilots who had been encouraged to participate in the BRA's early

14

retirement program. Plaintiffs have offered no evidence indicating this decision was "wholly irrational." See Garrison, 334 F.3d at 538-39.

There is evidence indicating that the Claim was only meant to compensate for concessions offered from December 1, 2004 through December 31, 2006.[4] ALPA, however, concluded that the agreement also was meant to reimburse pilots for all of the concessions they offered under the BRA, which ran through December 2011. A reasonable jury could not conclude that this decision was "wholly irrational," however. Many of Plaintiffs themselves testified that ALPA's conclusion that the concessions were meant to compensate for, among other things, all of the concessions offered under the BRA was reasonable. In addition, the Claim was provided for under the BRA itself.

In the end, although there are factual disputes regarding whether ALPA adopted the best course of action in distributing the Claim, Plaintiffs have failed to show that ALPA's actions were so arbitrary as to constitute a violation of the DFR. In particular, there is no evidence showing that ALPA's actions were any more than negligence, ordinary mistakes, flaws in judgment, or unwise or unconsidered decisions; and such actions are not arbitrary in violation of the union's DFR. See Garrison, 334 F.3d at 538-39. Thus, the Court finds that ALPA is entitled to summary judgment of Plaintiffs' DFR claim.

## V. CONCLUSION

---

[4] The Schedule attached to Letter 2006-03 indicated that the Claim share was meant to compensate for concessions made between 12/1/04 and 12/31/06.

For the reasons discussed above, ALPA's Motion for Summary Judgment is **GRANTED.** Furthermore, ALPA maintains in its motion that the other Defendant in this case, the NWA MEC, is only an "administrative body within ALPA," that "was not properly a party to this action, and no longer exists." (See doc. 38 n.1). As Plaintiffs have not disputed this, the Court will grant the Motion for Summary Judgment as to both Defendants.

**IT IS SO ORDERED.**

s/Marianne O. Battani  
MARIANNE O. BATTANI  
UNITED STATES DISTRICT JUDGE

DATED: June 8, 2010

## CERTIFICATE OF SERVICE

Copies of this Order were served upon counsel of record on this date by ordinary mail and electronic filing.

s/Bernadette M. Thebolt  
Case Manager